Jean TERWILLIGER, et al., Plaintiffs,

v.

HOME OF HOPE, INC., Defendant.

No. 96–CV–1042H.

United States District Court,
N.D. Oklahoma.

March 18, 1999.

Gerald Robert Lee, Pryor, OK, for plaintiffs.

J. Patrick Cremin, Hall Estill Hardwick Gable, Golden & Nelson, Tulsa, OK, Terry Scott O'Donnell, Karen Marie Grundy, Best Sharp Holden Sheridan Best & Sullivan, Tulsa, OK, Kelly S. Kibbie, New York City, Brian E. Dittrich, Whitten, McGuire, Terry & Roselius, Tulsa, OK, Steven Ernest Holden, Holden Glendening & Turnbull, Tulsa, OK, for Home of Hope, Inc., defendant.

Mark Lawton Jones, Office of the Attorney General, Oklahoma City, OK, for Oklahoma Department of Human Services, amicus.

D. Kevin Ikenberry, Stephen L. Andrew, Stephen L Andrew & Associates, Tulsa, OK, for Gatesway Foundation, Inc., amicus.

## PLAINTIFFS' CONSENT TO ALLOW REPORT AND RECOMMENDATIONS OF SPECIAL MASTER TO BECOME FINAL JUDGMENT

Come now Martina Alexander, Rachel George, Linda Hadley, Tony Hooten, Francis Kerns, Carol Lacey, Kassey Samples, Carol Smallwood, Dixie Sparks, Tambra Suter, Dale Jean Terwilliger, Jody Terwilliger, Patricia Turner, Mary Weins and Carver West, Jr. by and through their attorney, Gerald R. Lee, and do hereby state:

1. Pursuant to discussions between the parties' attorneys it has been represented to the Plaintiffs' attorney that Defendant will not make a claim for its cost and attorney fees if the Plaintiffs do not file an objection to the Report and Recommendation of the Special Master.

2. Based upon the representation by the Defendant to waive its claims against the Plaintiffs for cost and attorney fees each of the above named Plaintiffs waives his/her right to file an objection to the Report and Recommendation of the Special Master and does further consent that the Court may enter a judgment according to the Report and Recommendation of the Special Master.

## REPORT AND RECOMMENDATION OF SPECIAL MASTER WITH PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

EAGAN, United States Magistrate Judge.

On November 12, 1996, plaintiffs brought this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, for alleged failure to pay overtime wages. Plaintiffs are employees, or former employees, of the defendant, Home of Hope, Inc. ("Home of Hope"). Home of Hope is a non-profit corporation which provides services to developmentally disabled individuals. Home of Hope did not pay plaintiffs time and a half for overtime hours for a two-year period between July 1, 1994 and June 30, 1996 when plaintiffs worked in Home of Hope's Supported Living Program as Habilitation Training Specialists ("HTS"), House Managers, or both. During that period of time, Home of Hope claimed to be exempt from paying overtime wages to plaintiffs because of the "companionship services" exemption found in 29 U.S.C. § 213(a)(15), which exempts payment of overtime wages to employees who provide "companionship services" for individuals who are unable to care for themselves.

Plaintiffs rely on an exception to the exemption which requires payment to employees who provide companionship services if those employees are found to have spent more than 20% of total weekly hours worked performing general household work unrelated or incidental to the care of the individuals whom they served. The

exception is found in the pertinent regulations at 29 C.F.R. § 552.6. Home of Hope maintains that plaintiffs did not spend more than 20% of their time performing general household work unrelated or incidental to the care of the individuals and thus, they do not fall within the "20% exception," or, as it is sometimes referenced, the "general household work exception."

The Court has previously adjudicated numerous issues. By Order dated January 7, 1998, the Court granted partial summary judgment to Home of Hope and held that certain plaintiffs were not entitled to "on-call" compensation. By Order dated May 21, 1998, the Court ruled on cross-motions for summary judgment, holding that (1) Home of Hope employees provided services to individuals in "private homes" as required by the companionship services exemption; (2) each plaintiff provided "companionship services" as required by the exemption; and (3) plaintiffs were not "trained personnel" for purposes of the 20% exception to the companionship exemption. After a hearing on two of the three remaining issues, the Court held that plaintiffs failed to meet their burden of proof to establish that Home of Hope committed a willful violation of the FLSA when Home of Hope applied the companionship services exemption and did not pay overtime wages to plaintiffs. Thus, a two-year statute of limitations applied to plaintiff's claims instead of the three-year statute of limitations applicable for willful violations. (Order dated July 24, 1998).

In its Order of May 21, 1998, the Court declined to resolve by summary judgment the issue of whether the plaintiffs spent more than 20% of the total hours they worked each week performing "general household work" unrelated to the care of the individuals they served. Preferring to await a fully developed factual record, the Court appointed the undersigned as Special Master, pursuant to 28 U.S.C. § 636(b)(2). The Court and the Special Master separately toured two of the group homes in which four of Home of Hope's developmentally disabled clients live. The

Court toured the homes on April 24, 1998, and the Special Master toured the homes on August 28, 1998, before the "20% issue" was tried to the Special Master on September 28, 29, 30, October 13, 14, 19, 21, and 26, 1998.

Thirty-six of the original fifty plaintiffs were dismissed prior to the conclusion of the hearings before the Special Master. The remaining fourteen plaintiffs appeared at the evidentiary hearings: Martina Alexander, Tony Hooten, Dale Jean Terwilliger, Jody Terwilliger, Rachel George, Carver West, Mary Weins, Linda Hadley, Francis Kerns, Carol Smallwood, Carol Lacey, Dixie Sparks, Pat Turner, and Tambra Suter. In response, Home of Hope called its Program Manager/Director of Residential Homes Cindy Collins; its Lead Program Coordinator/Program Manager Rebecca Collins; Program Coordinator Judy Baker; former Program Coordinator Terry Wise; and former House Managers Robin Standley, Stacie Cloud, and Gene Jones. In addition, Home of Hope called as witnesses John Rowe, former supervisor with the State of Oklahoma Department of Human Services (the agency which oversees the Supported Living Program), and Cynthia Reynolds, Ph.D., a psychologist who evaluated some of the Home of Hope clients served by plaintiffs.

Plaintiffs each submitted their time cards as well as calculations, performed by Jo Rice, of the time each plaintiff claims as overtime for which he or she was not paid. Home of Hope submitted time cards, calendars, personnel files, discovery responses, and training information for each plaintiff. Home of Hope also submitted the Individual Habilitation Plan ("IHP") and other data regarding each client whom plaintiffs served. Finally, Home of Hope submitted a document indicating the square footage for each group home in which plaintiffs worked, and the 1995–96 "Contract" that each plaintiff signed when he or she was employed by Home of Hope.

The parties submitted proposed findings of fact and conclusions of law after the

evidentiary hearings, all of which the Special Master has carefully considered. Based upon the testimony and exhibits presented to the Special Master at the evidentiary hearings, the Special Master recommends that the Court adopt the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Stipulations and Admissions

1. Home of Hope is a not-for-profit corporation whose mission is to serve developmentally disabled individuals.

2. Each plaintiff was an employee of Home of Hope during some period of time between July 1, 1994 and June 30, 1996.

### In General

3. The applicable limitations periods are: Dale Jean Terwilliger, November 12, 1994 through June 30, 1996; Pat Turner and Linda Hadley, March 28, 1995 through June 30, 1996; all other plaintiffs, June 18, 1995 through June 30, 1996.

4. The plaintiffs in this action were employed in Home of Hope's Supported Living Program as either HTS or House Managers. HTS work in clients' homes to supervise clients' daily routines and activities, as outlined in the IHP for each client. The IHP is the plan of care for each individual client created by the client's treatment team, and includes goals and training objectives for that client. HTS provide specific training to clients based upon program plans involving skills in household chores and responsibilities such as cooking, cleaning, washing clothes, and money management, among others. House Managers perform essentially the same functions as HTS, but have added responsibility in the area of paperwork and money management.

5. House Managers expected staff to teach clients to live in their own homes; most of the clients in the Supported Living program came directly from Hissom Memorial Center, a state institution for devel-

opmentally disabled persons.[1] Job descriptions for HTS and House Managers coincide with one of the goals of the Supported Living Program, which is to involve the clients in the activities of the community to the fullest extent possible, given the clients' needs and limitations. A related goal of Supported Living is normalization. Normalization means equipping clients to reside in an environment which approximates that of other people in the community.

6. Prior to beginning work in Home of Hope's Supported Living Program, each of the plaintiffs received extensive training designed to meet the needs of clients. Training for Supported Living staff emphasizes integration of the client into the community and teaching the client independent living skills. The training received by the staff in Supported Living did not include training in how to clean.

7. Client houses were not spotless, nor were they expected to be; they were expected to be clean enough that Home of Hope employees would not be embarrassed. In other words, Home of Hope employees were to use the same standard of cleanliness as in their own homes. Client houses were generally not any dirtier than ordinary houses. The sizes of Supported Living Program clients' houses ranged from 938 square feet to 2,500 square feet, with most houses averaging approximately 1,100 square feet. Each client home was staffed by multiple employees of Home of Hope, and all staff members were responsible for keeping clean the homes in which they worked; no plaintiff did all the cleaning in any particular home.

8. Home of Hope's "chore lists" posted in some clients' homes were not lists of mandatory cleaning requirements. Home of Hope intended them to be used as prompts or reminders for HTS and House Managers to check from time to time. If an area was not dirty, it should not have

---

1. Hissom was closed by court order beginning in 1987. *See Homeward Bound, Inc. v.*

*Hissom Memorial Center,* Case No. 85–C–437–E 1987 WL 27104 (N.D.Okla. July 24, 1987).

been cleaned simply because a task was on the list. Houses were not inspected by the House Manager or Program Coordinator for cleanliness. However, House Managers or Program Coordinators would have noticed if clients' homes were not presentable when they visited the homes for other purposes relating to the client.

9. While Home of Hope expected the clients' homes to be clean, the goal for HTS and House Managers was to involve the individual client in doing household tasks to the extent that the client was capable. Staff members were not supposed to do tasks for clients that clients could do for themselves, albeit imperfectly or slowly. To the extent that the plaintiffs performed tasks for which clients were able, such work would have a deleterious effect on clients' functioning and would impede the goal of normalization. A sterile or spotless home would not achieve the goal of normalization; such an environment would resemble a hospital or institution—a result contrary to the intent of the Supported Living Program. A spotless or sterile house is different and segregated. Thus, in the overall plan of the Supported Living Program, house cleaning was significant to the extent that it involved the clients' habilitation or incidental teaching goals or was necessary for safety and sanitation. The expectation of Home of Hope management was that each client would clean his or her own house, if able; staff would not clean house for a capable client.

10. Similarly, the State of Oklahoma Department of Human Services ("DHS") wanted client houses to be safe and secure, and the DHS wanted providers to integrate clients into the community. The cleanliness of clients' private residences was not a high priority to the DHS unless it became an issue of safety or sanitation. The DHS did not expect the houses to be spotless or sterile. The expectation of the DHS was the same as the expectation of Home of Hope management: the client, not staff, would clean house if the client were capable.

11. Some Home of Hope clients were incapable of cleaning; these were considered "total care" clients. Those that had some capability were considered "higher-functioning," depending primarily upon their adaptive ages. A client's adaptive age is the age level at which a client is able to function. The adaptive ages of clients in Home of Hope's Supported Living Program with whom the plaintiffs worked ranged from 4.5 months to eleven years. In deriving the client's adaptive age, an examiner determines whether the individual can and does perform certain activities. The adaptive age is used to set goals and objectives, including incidental teaching for clients served by Home of Hope's Supported Living Program.

12. Home of Hope utilized the companionship services exemption from July 1, 1994 through June 30, 1996. During the relevant time, each of the plaintiffs was advised that the Home of Hope was not paying overtime wages. Employees were not required to work in excess of 40 hours during the relevant time, but some staff members volunteered to work in excess of 40 hours. No plaintiff filed a grievance with the State or Federal Departments of Labor for overtime wages during the relevant time.

13. If the HTS were spending a substantial amount of time cleaning, Home of Hope expected staff to bring this to the attention of a House Manager or Program Coordinator. From July 1, 1994 through June 30, 1996, none of the plaintiffs reported to the Program Coordinators or House Managers that they spent in excess of 20% of their weekly hours worked engaged in house cleaning activities or activities unrelated to the care of the client. Home of Hope was not aware during the relevant time that any plaintiff was engaged in extraordinary cleaning activities, and Home of Hope was not aware during the relevant time of any plaintiff spending in excess of 20% of his or her weekly work hours on general household work.

14. Former House Manager Gene Jones testified that he spent no more than four hours per week on cleaning. Former House Manager Stacie Cloud testified that she spent at most two hours per week cleaning when she was an HTS.

15. No one created contemporaneous records establishing the amount of time spent by HTS or House Managers in general household work unrelated to the individual. Plaintiffs' answers to Interrogatory No. 25 represent the plaintiffs' attempts to estimate their time spent performing various tasks. The categories of activities contained in those answers were formulated by the plaintiffs' attorney and, in several instances, were completed in the attorney's handwriting. The time estimates contained in those answers are not specific to any one client, do not take into account the clients' varying needs and limitations, and were based on plaintiffs' memories some years after the events. The time estimates do not include time spent training, filling out paperwork, sleeping, attending to clients' medical needs resulting from seizures, falls, tantrums or behaviors, or otherwise monitoring clients.

16. From July 1, 1994 through June 30, 1996, no staff member ever reported to a Program Coordinator or House Manager that he or she was not sleeping during a night shift, or that any staff member was cleaning all night. If a staff member was not sleeping and the house was not an "awake" house, Home of Hope expected this situation to be brought to the attention of a House Manager or Program Coordinator.

17. Since part of the job of the HTS is to encourage the client to participate in daily living skills, if a client chose not to participate in daily living skills on a consistent basis, the situation should have been brought to the attention of the treatment team by the HTS so that the client's goals could have been adjusted. If the client refused to participate in daily living skills

on a consistent basis, the staff should have written this information in the client's daily activity log.

18. Objective, contemporaneous records such as IHPs and daily activity logs support the conclusion that the plaintiffs did not spend in excess of 20% of their weekly work hours engaged in activities unrelated to the care of clients in the Supported Living Program. Services performed by the plaintiffs on behalf of clients who could not perform such tasks independently constitute services related to the care of the client. The time spent by the plaintiffs in training clients on incidental teaching and habilitation goals and time spent training clients in daily living skills also constitute services related to the care of the client.

### Individual Plaintiffs[2]

#### Martina Alexander

19. Plaintiff Martina Alexander began employment in Home of Hope's Supported Living Program on April 21, 1994. She was advised that Home of Hope was not paying the premium portion for overtime. Typically, Ms. Alexander had a 40 to 42 hour shift, from 3:00 p.m. on Friday afternoon until Sunday morning at 7:00 or 9:00 a.m.

20. Upon examination at the hearing, Ms. Alexander agreed that an HTS provides fellowship, care, and protection to persons who cannot care for their own needs due to physical or mental infirmity. An HTS does not administer injections of medications or decide which kinds of therapy or treatment a client will receive. She also agreed that the HTS job summary requires the HTS to provide specific training to individual clients involving skills in household chores and responsibilities such as cooking, cleaning, washing clothes, and money management, as outlined in the program plans.

2. Although Kassey Samples is included in plaintiff's Proposed Findings of Fact, the Special Master notes that Ms. Samples was dismissed from the litigation. (See Stipulation of Dismissal Without Prejudice, Docket # 103.)

21. Ms. Alexander testified that the duties and responsibilities of an HTS include implementing any training in the IHP, teaching, preparing meals, helping clients with meals and cleaning up after meals, bathing clients, and charting daily activities. She also testified that meal preparation, dishes, laundry, bed making, cleaning up spills, and picking up toys or personal items of the client constitute housework related to the care of the client, not "general household work."

22. From April 1994 until October 1995, Ms. Alexander worked in the home of Geno (Bert) Marlow and Roger Needham. Geno Marlow's physical limitations included mental retardation, seizure disorder, mild spastic quadriplegia, and reflux. He had limited verbal skills and needed consistent staff. During the relevant time, Geno Marlow's adaptive age was two years, ten months. His psychological assessment indicates that he was eager to help with tasks around the home, but was limited in his ability and required supervision. His incidental teaching goals included household chores, but he required physical and verbal assistance to accomplish most household chores. With regard to personal hygiene, Geno Marlow required hand-over-hand assistance.

23. Roger Needham's physical limitations included severe mental retardation, and he had difficulties with effective expressions. He required assistance with his self-care needs. He had limited verbal skills and did not like strangers. During the relevant time period, his adaptive age was four years, eleven months. The daily activity logs for the Marlow/Needham home indicate that the clients assisted in the household chores. They also went on several outings, during which time Ms. Alexander could not have been cleaning the house.

24. From October 1995 until August 1997, Ms. Alexander worked in the home of Tom Horn and Lonnie Birdtail. Lonnie Birdtail's physical limitations included seizure disorders and mental retardation. During the relevant time in 1995, his adaptive age was four years, seven months. His goals, as set forth in the IHP, were to independently complete basic home maintenance and independent living skills, and to independently pick up, sort and do his laundry. One of Lonnie Birdtail's incidental teaching skills was to clean and maintain his home. His psychological evaluation indicates that frequent repetition and redirection to task were required to aid him in task focus.

25. Tom Horn's physical limitations included mental retardation, autism and seizures. During the relevant time, his adaptive age was seven years, two months. His IHP indicates that one of his needs related to functional daily living, and that his incidental teaching goals included meal preparation and household chores. In August 1995, he was becoming more independent with laundry and self-care skills, but still needed assistance with such tasks as laundry and cleaning his room. Although autistic, he was capable of doing work around the house, but it would take him a long time if he repeated a task, like washing the table, numerous times.

26. The Horn/Birdtail house was double-staffed during waking hours. Weekly calendars and daily activity logs of the Horn/Birdtail house indicate that the clients assisted in household chores. They also went on numerous outings and trips to Tulsa, during which time Ms. Alexander could not have been cleaning the house.

27. Ms. Alexander's estimate of her time performing general household work in answer to Interrogatory No. 25 does not include required duties such as paperwork, sleep time or training time.

28. In February 1995, Jeanette McCleary warned Ms. Alexander about Ms. Alexander's poor housekeeping skills. Ms. Alexander denied any other reprimands or warnings about her housecleaning skills, although documents indicate the she was counseled regarding her lack of housekeeping. The evidence also showed that Ms. Alexander's supervisor deemed her lacking in housecleaning skills.

29. Ms. Alexander testified that deep cleaning duties were rotated among the four to five staff in each house in which she worked. If all of the four HTS staff in the Horn/Birdtail house in which Ms. Alexander worked during the relevant time spent in excess of 20% of their weekly hours worked performing general household work (or 10 hours, as claimed by the Ms. Alexander in her discovery responses), the staff would have spent 40 hours cleaning a house which had a maximum square footage of 1,250 feet. The Director of Residential Homes for Home of Hope's Supported Living Program, Cindy Collins, testified that it would not have taken each staff member 10 hours per week to maintain the Horn/Birdtail or Marlow/Needham residences.

### Tony Hooten

30. Plaintiff Tony Hooten was employed in Home of Hope's Supported Living Program from May 28, 1995 through June 30, 1996. When he was hired, Mr. Hooten knew that Home of Hope was not paying the premium portion of overtime. No one discussed cleaning duties with him at that time. Mr. Hooten testified that housework related to the care of a client includes health care, keeping the toilet sanitary, and cleaning the dishes and food surfaces. He also testified that persons other than himself performed cleaning chores in the clients' houses where he worked.

31. During the time he worked in Supported Living, Mr. Hooten primarily worked in the home of Tim Bogle. During the relevant time period, Tim Bogle's adaptive age was eleven months. Staff members at the Bogle house required special training, and Tim Bogle needed consistent staff because he was non-verbal and required total care. Even his food had to be pureed. He crawled on the floor, so the mopping and dusting were related to his care. Obviously, he could do no household work. His physical limitations included profound mental retardation, seizure disorder, spastic paraplegia, and other assorted health problems such as congestive heart failure, food aspiration, tremors and seizures. After he became medically fragile, his residence was double-staffed twenty-four hours per day.

32. Rebecca Collins was the Program Coordinator for the Bogle house during the relevant time period and was familiar with the activities of the house because Tim Bogle's medical condition required her to make frequent visits. She testified that, while there was some household work to be done, no HTS was supposed to be doing all the work by himself or herself. Those responsibilities were to be divided by the eight staff members who worked in the house. If staff members each spent 10 hours (or a total of 80 hours) cleaning Tim Bogle's 1,000 square foot home, Ms. Collins was not aware of it. In the Bogle house, most of the household work was related to the care of the client.

33. After he worked in Tim Bogle's home, Mr. Hooten worked in the residences of Matthew Ledbetter, Heath Elliott, Shawn Allison and Gary Pritchard. Matthew Ledbetter could perform some household work, including wiping the sink and vacuuming. Mr. Hooten testified that, other than Matthew Ledbetter, no other clients could perform housework.

34. During his tenure at Home of Hope, Mr. Hooten was reprimanded for failing to arrive at work on time. Mr. Hooten is not seeking overtime compensation for time he spent sleeping, or for time when his clients were in the hospital, in respite care, or were not in their homes. It is not plausible that Mr. Hooten spent in excess of 20% of his weekly hours worked engaged in general household work unrelated to the care of the clients he served.

### Dale Jean Terwilliger

35. Plaintiff Dale Jean Terwilliger was employed by the Home of Hope from February 24, 1992 through July 8, 1996. From February 15, 1994 through March 29, 1995, Ms. Terwilliger worked as an HTS; from March 30, 1995 through July 8, 1996, Ms. Terwilliger worked as a House

Manager. As a House Manager, Ms. Terwilliger was required to undertake additional responsibilities such as paperwork, keeping track of clients' funds, and transporting clients to doctor appointments. Ms. Terwilliger is not seeking overtime compensation for time spent sleeping or for "task time."

36. Ms. Terwilliger worked at the home of Johnny Dobbins, Kenny Allen and Ronnie Potter (the "DAP" house) for approximately fourteen months. Ms. Terwilliger worked for Shawn Allison and Tim Bogle [3] when they lived together, and then for Shawn Allison when he moved to his own house. The last house in which she worked was the home of Norman Gehring. Ms. Terwilliger is not claiming overtime for time spent in the Bogle or Allison house. She is making a claim for overtime wages for time spent working in the DAP and Gehring houses.

37. The DAP house was double-staffed from 9:00 a.m. to 10:00 p.m.; there were three HTS and one House Manager. At the DAP house, the clients were capable of doing most of the chores Ms. Terwilliger characterized as "general household work."

38. During the relevant time period, Johnny Dobbins' adaptive age was seven years, four months. He could vacuum, dust, do laundry, load a dishwasher, and wash and dry dishes. He was independent in his self-care skills, could make his bed and fix simple meals.

39. During the relevant time period, Kenny Allen's adaptive age was five years, seven months. His self-assessment reflected that he could clean his room, do his laundry, put dishes in the dishwasher and take them out, and hang up his clothes. His Residential Provider Monthly Report indicates that he always participated in household activities.

40. During the relevant time period, Ronnie Potter functioned on the same level

as Kenny Allen; however, Ronnie Potter had a seizure disorder.

41. Norman Gehring was also a higher-functioning client; he did his own laundry. Rebecca Collins testified that Norman Gehring's house was a typical "bachelor pad"; it was not spotless.

42. Rebecca Collins has seen Ms. Terwilliger's clients performing duties characterized by Ms. Terwilliger as "general household work." Kenny Allen and Ronnie Potter liked to mop. Ms. Collins has seen Ronnie Potter dust and sweep, and she has seen Kenny Allen dust. Ronnie Potter liked to vacuum. Further, Kenny Allen, Ronnie Potter, Johnny Dobbins and Norman Gehring have all been employed in jobs requiring housekeeping skills.

43. Ms. Terwilliger admitted that the clients in the DAP house and Norman Gehring could do laundry, sweep, vacuum, dust and take out the trash. But she stated that it was faster for her to do tasks without the clients, even if the clients were capable of performing these duties. While Ms. Terwilliger testified that Kenny Allen, Ronnie Potter, Johnny Dobbins and Norman Gehring would not participate in household chores, the daily activity logs relating to these clients indicate otherwise.

44. Ms. Terwilliger testified that, if the client lost control of bladder or bowels, the cleanup could be the same as cleaning up a spill or making the client's bed, i.e., household work related to the individual.

45. Ms. Terwilliger did not understand that if she worked sixty hours, she would have had to spend twelve hours herself doing tasks unrelated to client care in order to qualify for the 20% exception. Ms. Terwilliger admitted that her answer to Interrogatory No. 25 accurately summarized the time she spent performing general household work. Ms. Terwilliger's answer to Interrogatory No. 25 does not reflect that she spent more than 20% of

---

3. However, Ms. Terwilliger testified that the male staff at the Bogle house were supposed

to take care of the client and the female staff were to cook and clean.

her weekly hours worked performing general household work.

### *Rachel George*

46. Plaintiff Rachel George was employed by the Home of Hope from May 26, 1995 through September 30, 1996. At the time Ms. George began her employment, she was advised that Home of Hope was not paying the premium portion for overtime. Ms. George testified that she worked from 9:00 a.m. to 10:00 p.m. on weekdays and 8:00 a.m. to 10:00 p.m. on Sundays.

47. Before she started as an HTS, Ms. George participated in extensive training, including Foundations, Basic Health Management, Medication Administration, Effective Teaching Therapy and Advanced Meal Time Challenges. The emphasis of her training was on teaching and caring for the client.

48. During her employment with Home of Hope, Ms. George worked at the Guinto/Whomble house, the Cluck/Thompson house, the Moad/McMullin and Morris house, and the Conwell/Green house. She was an HTS at all of these houses, and a House Manager in the Conwell/Green house. Ms. George is asserting a claim for overtime pay only as to the Conwell/Green house; her household work in the other houses was either not in excess of 20% of her total work week or it was all for the clients' benefit. Even though Ms. George testified that the Conwell/Green home was "very large," it was, in fact, only 1,000 square feet; the Moad/McMullin and Morris home, in which Ms. George had previously worked, was substantially larger.

49. Cheryl Conwell was blind and nonverbal; she could not participate in general household work. At the relevant time, her adaptive age was one year, eleven months. She had significant behavioral issues that required immediate staff attention: she was self-injurious, engaged in screaming, dropping to the ground and dragging herself, and stripping off her clothes or becoming physically aggressive. Some of these behaviors would last up to two hours. Ms. George testified that Cheryl Conwell could do no work for herself; therefore, work performed in Cheryl Conwell's house related to her health and safety.

50. Melva Green was verbal, but mentally retarded. During the relevant time, her adaptive age was three years, ten months. While Ms. George testified that Melva Green would not participate in the general household work, the daily activity logs relating to Melva Green indicate otherwise. Melva Green was employed by the training center at Claremore where she vacuumed, cleaned bathrooms, wiped off tables, swept, mopped, and cleaned the windows. While she was at work, there was only one staff member on duty in her home. Melva Green's Long Term Care Assessment indicates that she maintained cleanliness and order. Her Residential Assessment recites that she "does home maintenance with very little prompting." Her vocational profile states "I like to clean." Her IHP indicates that "she has personal household duties that she completes independently"; "she has improved the quality of her cleaning skills in the home"; and "she likes to keep her room neat."

51. One of the essential job functions contained in the House Manager's job description signed by Ms. George is "assuring that individuals have the opportunity to participate in the community." While Ms. George testified that Home of Hope would expect her to perform essential job duties, she also stated that she delegated some of her House Manager duties, such as paperwork, to HTS staff. Home of Hope did not approve of House Managers delegating essential functions to HTS staff.

52. Ms. George's claim as to the amount of time she spent doing tasks unrelated to the care of the clients is not plausible because one client required total care (Cheryl Conwell), and the other was capable of performing general household work (Melva Green). Ms. George shared equal responsibility with other staff members for keeping the home clean; if all of

them cleaned as Ms. George claims she cleaned, the result would have been 45.9 total housework hours in a 1,000 square foot house. This is inconsistent with caring for total care clients.

### Jody Terwilliger

53. Plaintiff Jody Terwilliger was employed by the Home of Hope as an HTS in the Supported Living Program from August 4, 1995 through August 11, 1997. Ms. Terwilliger is not making any claim for overtime compensation for the time she spent training.

54. While Ms. Terwilliger worked in Home of Hope's Supported Living Program she was a "floater": she was not assigned to any specific house. However, her claim for overtime pay is apparently based on the time she spent in the home of Bobby Hartley and Paula Cupp.

55. During the relevant time, Bobby Hartley's adaptive age was eight years, three months. He worked at Vinita Flag and Apron, and, at the time of the hearing, he worked for the Home of Hope cleaning crew doing janitorial work at Home of Hope. Rebecca Collins has seen him clean her office (mopping the floor, cleaning the toilet, vacuuming, dusting, cleaning bathrooms, wiping baseboards and doors) as a part of his duties with the cleaning crew.

56. During the relevant time, Paula Cupp had an adaptive age of eleven years. She worked at Wendy's where she wiped tables; at the time of the hearing, she was also employed by the Home of Hope cleaning crew. Obviously, Bobby Hartley and Paula Cupp were higher-functioning clients who could have performed cleaning tasks in their own home.

57. Ms. Terwilliger denied ever having been disciplined for not properly cleaning; however, the documents contained in her personnel file establish otherwise. In fact, she was verbally counseled for not participating in household activities such as cleaning. Ms. Terwilliger was also reprimanded by DHS Case Manager Charlotte Cooper for watching television instead of caring for Tim Bogle, who was medically fragile.

58. Ms. Terwilliger failed to offer any testimony regarding the time in which she spent engaged in various tasks she considers to be "general household work." Further, Ms. Terwilliger's estimate of general household work, as reflected in answer to Interrogatory No. 25, fails to demonstrate that she spent more than 20% of her weekly hours worked performing general household work.

### Carver West

59. Plaintiff Carver West was employed in the Home of Hope's Supported Living Program as an HTS from 1991 until February 1995, and from September 1995 until March 1997. When Mr. West returned to Home of Hope in September 1995, he knew that he would not be receiving overtime.

60. Mr. West considered direct time with the client to be companion service. West understood that tasks performed for the benefit of the client such as bed making, washing clothes and cleaning spills do not count as general household work.

62. During the relevant time period, Tim Bogle's adaptive age was eleven months. His behaviors included physical aggression, seeking attention and impulsivity. He also had eating and sleeping disturbance and a poor attention span, and he required the administration of breathing treatments. A psychological assessment performed by Dr. Cynthia Reynolds for Tim Bogle describes his many physical problems and behaviors. Tim Bogle could do nothing for himself.

63. Consequently, Tim Bogle was not able to assist or perform any household cleaning. His self-assessment indicates that he could not sweep, mop, wash dishes, make beds, do laundry or prepare his own meals. Mr. West agreed that making the bed was for Tim Bogle's benefit; washing the dishes was for Tim Bogle's benefit because he ate from the dishes; mopping, vacuuming and sweeping the floor were for Tim Bogle's benefit because he crawled around on the floor and put things in his

mouth; laundry and meal preparation were tasks for the benefit of Tim Bogle; and dusting was related to Tim Bogle's care and safety because he had allergies.

64. Tim Bogle's Residential Assessment indicates that he needed total assistance with dressing, undressing, toileting, bathing, shampooing and hair combing, tooth brushing, and food preparation. Due to his health, he needed total assistance with home maintenance such as vacuuming, dusting, sweeping, washing dishes and making his bed. The Residential Provider Monthly Report for Tim Bogle, dated June 5, 1996, indicates that he could not work toward any goals. During the relevant period of time, Tim Bogle was incontinent; therefore, it would not have been necessary for Mr. West to clean Tim Bogle's toilet daily or weekly. For the same reason, it is reasonable to assume that it would have taken more than the one hour indicated by Mr. West to do laundry for Tim Bogle.

65. From June 1995 through June 1996, Tim Bogle's health was deteriorating. He had daily seizures and tremors, congestive heart failure, and he was confined to a wheelchair. He was also on a diet of applesauce consistency due to his aspiration problems. Medication administration was important in Tim Bogle's life due to the many medications he was taking. Mr. West received verbal counseling for failure to follow the medical protocol. The evidence establishes that Mr. West was also reprimanded in March 1996 because he failed to chart, he left all the lights on in the house, and the house was dirty. Mr. West could not recall being reprimanded.

66. Due to Tim Bogle's poor health, it is implausible that each of the eight persons who worked in his home spent ten hours per week performing tasks unrelated to him. Further, the evidence showed that staff members were authorized to watch cable television in the Bogle home during their down time. Other plaintiffs who worked in the Bogle house from September 1995 included Tony Hooten, Jody Terwilliger, Dixie Sparks, and Dale Jean Terwilliger. Mr. West did not agree with the testimony of Dale Jean Terwilliger that the men took care of Tim Bogle and the women did all the housework.

67. From June 1995 through June 1996, Rebecca Collins was the Lead Program Coordinator/Program Manager for the Supported Living Program at Home of Hope; part of her duties entailed supervision of the Bogle house. Ms. Collins visited the Bogle home weekly and sometimes daily. The purpose of her visit to the home was usually related to Tim Bogle's health, not to inspect for cleanliness. Ms. Collins did not expect Tim Bogle's house to be spotless, because he required too much personal care.

68. During a seventy-five hour work week, Mr. West would have had to spend in excess of fifteen hours himself doing tasks unrelated to Tim Bogle's care in order to be entitled to overtime pay. During the week of February 4, 1996 through February 10, 1996, Tim Bogle was in the hospital; thus, Mr. West's claim that he spent fifteen of this 75 hours cleaning the Bogle house is not credible. During the June 1995 to June 1996 time period, Tim Bogle was hospitalized or in respite care for a total of ninety days. When Tim Bogle was in the hospital for extended periods of time, Mr. West admitted that he was not cleaning the client's residence.

### Mary Weins

69. Plaintiff Mary Weins was employed in Home of Hope's Supported Living Program from December 15, 1995 through December 30, 1996 as an HTS. At the time she began working for Home of Hope, she was aware that she would not be paid time-and-a-half for hours worked in excess of forty. She is not making a claim for overtime pay for any week in which she worked less than 40 hours, and she is not making a claim for overtime pay for time while she was in training.

70. Her training was tailored to the needs of individual clients and homes, and

it was designed to help her better serve the needs of her clients. None of her training focused on cleaning or housework. The time she spent training was time she could not have spent cleaning the house; therefore, if she did not work over 40 hours providing care to the client, that week would not qualify for the 20% exception. Ms. Weins testified that training and charting, among other tasks she performed, were not contained in the estimated time categories of her answer to Interrogatory No. 25.

71. Ms. Weins claims to have spent ten hours of a 40–hour work week performing general household cleaning, twice as much time as she listed for any other activity (the same estimates apply to each house). However, on her performance evaluation for the relevant time, "house cleaning" is not listed among the four major tasks required by Home of Hope for her job as HTS. She knew that the job description for an HTS focuses on training the individual client to live independently. It does not mention household chores to be performed by the HTS, nor does it specify that the HTS will provide a maid service for the client. She understood that it was her duty to help the individual clients learn independent living skills, and that part of her job as an HTS was to encourage clients to maintain their homes. Home of Hope requires that HTS workers know how to clean a house so they can teach this skill to clients.

72. Ms. Weins spent the majority of her time in Supported Living working in the homes of Joey Guinto, Joel Whomble, Cheryl Conwell, and Melva Green.

73. Ms. Weins did not commence work at the Guinto/Whomble house until the week of January 21, 1996. Her shift at the Guinto/Whomble house was 3:00 p.m. to 9:00 a.m., a shift of approximately seventeen hours. She worked Monday through Friday. Ms. Weins believed that every staff member at the Guinto/Whomble house was cleaning ten hours in a 40–hour work week. Both clients in the Guinto/Whomble house were employed. When the clients were not at the house during the day, the staff was not at the house.

74. Joey Guinto could vacuum, dust, take out the trash and fold his clothes; he had no physical limitations. Program Coordinator Judy Baker saw Joey Guinto sweep, carry out trash, clean, wipe and set the table, and put dishes in the sink. She testified that he was always eager to please when he was asked to help. Most of the time, Joey Guinto would do what staff members asked him to do.

75. Joel Whomble could vacuum and dust, sweep, wash windows, and fold his laundry. He worked at the Claremore Hospital in the laundry. He was capable of doing many different tasks, if asked. The incidental teaching on his documentation indicates that the staff were supposed to be training him to vacuum, sweep, wash and cook meals. He participated in these activities and, in fact, Ms. Baker witnessed him assisting with meals.

76. An HTS would not have had an opportunity to spend greater than 20% of his or her time cleaning in the Guinto/Whomble house due to the activity level of the clients who lived there. Further, Joey Guinto and Joel Whomble were willing and helpful in taking care of household chores. Ms. Weins admitted that because the clients at the Guinto/Whomble house would help, she could not have spent in excess of 20% of her weekly work hours performing general household work. Ms. Baker testified that it was not reasonable for Ms. Weins to estimate that she spent three hours in a 40–hour work week teaching living skills; teaching occurred on a constant basis with clients such as Joey Guinto and Joel Whomble.

77. Ms. Weins' shift at the Conwell/Green house was 3:00 p.m. to 9.00 a.m.; she worked the shift after Rachel George's shift. Another staff member was present at the house with Ms. Weins because Home of Hope required double-staffing in the Conwell/Green house.

78. Cheryl Conwell was blind and unable to participate in necessary home cleaning.

79. Melva Green was capable of cleaning; she made her bed, cleaned her room, dusted and laundered her clothes. Her IHP indicates that she also liked to clean; this would be consistent with Ms. Baker's experience in the Conwell/Green home. Further, Melva Green cleaned in the vocational center in Claremore by vacuuming, mopping, wiping tables and cleaning bathrooms. Ms. Baker has witnessed Melva Green sweep and mop, wipe tables, serve coffee, and dust.

80. Ms. Baker acknowledged that it is difficult to identify whether certain household tasks were done specifically for one client or the other. If one client requires total care, then the tasks performed for that client are not general household work, but related to the care of that client. Ms. Weins testified that she performed basically the same general household work in each of the houses; she did not tailor the chore list to the specific client served. Further, she said that she cleaned even if the room, area or object she cleaned was not dirty or did not need to be cleaned.

81. Ms. Weins' Program Coordinator for both houses was Judy Baker. As a Program Coordinator for the Supported Living Program, Judy Baker oversaw the care of the client, participated in the formulation of the client's IHP, and made sure the home was properly staffed. If Ms. Baker went to a client's home and it was presentable, she was satisfied with the staff's cleaning. A house would not be presentable if it had odors, if there were clothes lying around, or if the trash needed to be taken out. Ms. Baker tried to visit each home once or twice a week; sometimes she would visit more frequently. She inspected houses for cleanliness if staff members complained. As the Program Coordinator responsible for hiring staff, Ms. Baker explained in hiring interviews that the staff would not be paid overtime. Staff members were not required work overtime; it was optional.

82. If staff members felt that they were doing an inordinate amount of house cleaning, a procedure existed to report these complaints. Ms. Weins did not discuss with her House Manager or Program Coordinator the amount of time she spent cleaning. Ms. Weins never complained to Judy Baker about having to do an inordinate amount of cleaning unrelated to the care of the client. In fact, she does not recall what conversations, if any, she had with Judy Baker about cleaning duties and responsibilities in the homes.

83. Ms. Baker testified that two hours per week for transportation, as Ms. Weins estimated, would not be a reasonable estimate; transporting clients back and forth to work, shopping, and activities required much more than two hours. Further, she did not believe that any HTS could spend more than 20% of his or her time doing household chores unrelated to the care of the client in either the Guinto/Whomble or Conwell/Green homes. Ms. Weins understood that vacuuming the floor, if the clients spent time sitting or laying on the floor, is a household task "related to the individual" similar to making a client's bed. She admitted that she performed no household work or service unrelated to the care of the individuals whom she served.

### Linda Hadley

84. Plaintiff Linda Hadley was employed in Home of Hope's Supported Living Program from 1988 to March 1996, and again from August 1996 through the present.

85. In March 1995, plaintiff worked in the home of Betsy Gibson, Regina Reed and Roberta Taylor. At the Gibson/Reed/Taylor home, Ms. Hadley did the deep-cleaning and the cooking; the clients could and did participate in housework that pertained to their care. Four to five staff people worked at the home, and Ms. Hadley generally worked twenty-four hours at a time.

86. During the relevant time period, Betsy Gibson's adaptive age was seven

years, eight months. She could independently clean and make her bed. She has been employed in a variety of jobs, such as housekeeper and dishwasher, which required general house cleaning skills. Her biographical sketch indicates that she "shows initiative regarding house cleaning."

87. During the relevant time period, Regina Reed's adaptive age was seven years, eight months. One of her incidental training needs was to improve her home maintenance skills. One of her habilitation goals was to be independent in domestic household duties. She performed general household work in connection with her employment at Thomas Restaurant at Shangri–La Resort and Care Nursing Center.

88. During the relevant time period, Roberta Taylor's adaptive age was five years, seven months. In her psychological assessment, she was reported to be "neat," demonstrating good domestic skills including laundry and housekeeping. She was employed by Shangri–La where she washed and put away dishes, did general cleaning and took out the trash. She also worked at Pizza Hut. Her self-assessment during the relevant time establishes that she could vacuum, sweep, mop, wash dishes, make beds and prepare meals independently; she could do laundry with some assistance. Other documents in her IHP indicate that she enjoyed cooking and laundry. Ms. Hadley signed this document, and there is no accompanying statement of disagreement.

89. From August 1995 until March 1996, Ms. Hadley was the House Manager for Carol Frazier. Three employees worked at the Frazier home. As House Manager, Ms. Hadley had additional job duties, including paperwork. There is no listing for paperwork in her time estimate in answer to Interrogatory No. 25, although this activity occupied some of her time.

90. During the relevant time period, Carol Frazier's adaptive age was one year, two months. She could participate in general household cleaning only with hand-over-hand assistance. Her behaviors included aggressive screaming and physical aggression, including self-injurious behaviors (rocking, striking her head against the wall) and aggressive acts toward others (striking, slapping resulting in mild abrasions, choking, scratching, and hair pulling resulting in hair loss by others). Consistency in staffing was important for clients such as Carol Frazier who became agitated when new people were in the house. Three employees worked at the Frazier home.

91. In January 1996, Ms. Hadley also started working in the Marsh/Robinson home. Five staff members worked at the Marsh/Robinson house. Blaine Marsh and Sherry Robinson did most of the cleaning in their home themselves.

92. Blaine Marsh washed dishes, dusted and vacuumed. During the relevant time period, his adaptive age was five years, eleven months. He was employed by Shangri–La Resort, where he washed and put away dishes, sorted silverware and did general cleaning such as sweeping, mopping and taking out the trash.

93. During the relevant time, Sherry Robinson's adaptive age was five years. Ms. Hadley testified that Sherry Robinson refused to participate in household work. However, daily activity logs and other contemporaneous documents regarding Sherry Robinson establish that she did assist in general household work. Entries in those documents show that she cleaned house; made her bed; helped staff dust the furniture; did laundry; helped staff clean both bathrooms; helped prepare her lunch; set the table for supper; washed, rinsed and otherwise "helped with" dishes; swept the kitchen, wiped off the kitchen table, and otherwise "helped staff clean the kitchen." Sherry Robinson's staff noted that "she is very helpful in the kitchen and only needs verbal prompts sorting the laundry." Her July 1995 performance review indicated that she washed dishes, cleaned floors and took out the trash. If she had refused to perform household work, it is reasonable

to assume that the HTS would have documented her refusal in the daily activity logs. Further, she was employed at Shangri-La during the relevant time period, where her duties included unloading dishes, putting away dishes and general cleaning.

94. Ms. Hadley claimed that she deep-cleaned everything in the clients' home once per month, but she agreed that it is very important for clients to be given the opportunity to do tasks for themselves, if the clients were capable. Her performance evaluation indicates criticism of her for doing too much for the client. Notably, the performance evaluation lists four major job tasks required by Home of Hope, none of which includes cleaning. One of Ms. Hadley's performance evaluations indicated that she was always willing to work overtime. However, Ms. Hadley was not required to work overtime during the relevant time period.

95. Cindy Collins testified that the individual clients in the Supported Living Program were trained for many years to perform household tasks, and it would not have taken 20% of every work week to clean the houses at which Ms. Hadley worked. When Ms. Hadley estimated her time she did not take into account the individual needs of her clients. Her answer to Interrogatory No. 25 fails to demonstrate that she spent in excess of 20% of the weekly hours she worked performing general household work.

### Francis Darlene Kerns

96. Plaintiff Francis Darlene Kerns was employed as an HTS in Home of Hope's Supported Living Program from October 1994 through July 1996 and from April 1997 through August 1997. Her responsibilities as an HTS included charting, giving medications, housekeeping and assisting in the implementation of goals contained in the clients' IHPs. She testified that Home of Hope could rely on her to utilize her training and apply this training to the client. She also testified that Home of Hope would have discussed the cleaning list with staff if management discovered

that one person was doing too much of the cleaning.

97. At the time Home of Hope started using the companionship exemption, Ms. Kerns was advised that she would not receive time-and-a-half for hours worked in excess of forty. Program Coordinator Judy Baker testified that Ms. Kerns worked overtime hours on a voluntary basis during the relevant time period, although Ms. Kerns claimed that she was coerced into working overtime. Ms. Kerns' performance evaluations also indicate that she volunteered for extra work.

98. In June 1995, she worked in the home of Roberta Cluck and Donna Thompson in Claremore. Subsequently, she was transferred to the Conwell/Green home. At the Cluck/Thompson house, Ms. Kerns worked four days on, four days off, in twelve hour shifts from 6:00 p.m. to 6:00 a.m. She testified that, because she could not sleep in the Cluck/Thompson house, she performed cleaning duties during the early morning hours of her shift. At the Conwell/Green home, she had no set schedule. Ms. Kerns did not differentiate between her time estimates applicable to the Cluck/Thompson house and those applicable to the Conwell/Green house.

99. During the relevant time period, the adaptive age of Roberta Cluck was 4.5 months. Ms. Kerns described Roberta Cluck as a total care client. Roberta Cluck was non-verbal and bedfast. Her psychological evaluation establishes that she had limited adaptive skills, and she communicated by smiling or turning her eyes toward an object. She did not understand the concept of "yes" or "no." During the relevant time period, Donna Thompson's adaptive age was five months. Her limitations were essentially the same as those of Roberta Cluck.

100. Ms. Kerns' estimate of her overtime hours is incorrect in several aspects as it relates to the Cluck/Thompson house. Because Donna Thompson and Roberta Cluck did not have the capacity to learn living skills, Ms. Kerns could not have

engaged in five hours per week of teaching living skills to them. Since the clients rarely left their residence, it is improbable that Ms. Kerns engaged in three hours per week of outside activities. For the same reason, it is improbable that Ms. Kerns engaged in three hours per week of transportation for the clients. The house in which Donna Thompson and Roberta Cluck resided was 991 square feet. It is implausible that Ms. Kerns spent ten hours in a 40-hour work week on general house cleaning, given the size of the Cluck/Thompson home and the many needs of the clients who lived there.

### Carol Smallwood

101. Plaintiff Carol Smallwood was employed as an HTS and a House Manager in Home of Hope's Supported Living Program from September 1994 through May 1995 and again from August 1995 through March 1997. Ms. Smallwood makes no claim for overtime compensation between June 18, 1995 and August 1995; likewise, she makes no claim for the time period of December 31, 1995 through February 10, 1996. During the brief time that she was a House Manager, she had additional duties and responsibilities, especially with paperwork. Ms. Smallwood's performance evaluation for November 1995 contains a listing of four major job tasks required by Home of Hope, none of which is cleaning.

102. Ms. Smallwood worked in the Conwell/Green home from September 1, 1995 through October 21, 1995. Cheryl Conwell was a total care client; Melva Green performed some household cleaning. In October 1995, she began working in the home of Shawn Allison. Shawn Allison was a total care client who could do no general household work for himself.

103. She worked in the home of Tracy Goforth and Johnny Dobbins from January 1996 through June 30, 1996. At the Goforth/Dobbins house, Ms. Smallwood was an HTS. Terry Wise was the Program Coordinator for the Goforth/Dobbins house at the time Ms. Smallwood worked at the residence. When Mr. Wise came to the Goforth/Dobbins house, Ms. Smallwood

was often at the residence. Mr. Wise did not witness Ms. Smallwood engaged in any cleaning.

104. During the relevant time, Tracy Goforth's adaptive age was one year, eight months. He could walk and feed himself, but he had seizures and wore briefs. He needed assistance in dressing and undressing himself. One of his habilitation goals was house cleaning, although he required assistance with all home maintenance tasks. Ms. Smallwood signed his IHP. During the relevant time period, Johnny Dobbins' adaptive age was seven years, four months, and he could perform some household work.

105. Ms. Smallwood does not make a claim for entitlement to overtime compensation for time she spent sleeping or doing paperwork. Ms. Smallwood's answer to Interrogatory No. 25 lists several categories of tasks; missing from this list are sleeping and paperwork. Ms. Smallwood testified that her estimates in answer to Interrogatory No. 25 apply equally to clients, regardless of the needs of the individual clients. She also testified that her estimates applied to the Goforth/Dobbins house, and were not accurate as to other clients. Since Tracy Goforth and Shawn Allison both required considerable assistance with personal hygiene, Ms. Smallwood's estimate of two hours per week spent assisting the clients with personal hygiene appears to be too low. The evidence otherwise failed to demonstrate that she spent in excess of 20% of the weekly hours she worked performing general household work.

### Carolyn Lacey

106. Plaintiff Carolyn Lacey began employment in Home of Hope's Supported Living Program on September 19, 1994. During the relevant time, Ms. Lacey was an HTS. She agreed that the tasks contained in the HTS job description focused on care of the client to enable the client to live independently. Ms. Lacey's performance evaluations for 1995 and 1996 do not list housecleaning as one of the four

major job tasks required by Home of Hope.

107. From June 10, 1995 through October 1995, Ms. Lacey worked in the residence of Roberta Cluck and Donna Thompson, both of whom were total care clients.

108. From October 1995 through May 1996, Ms. Lacey worked in the home of Gary Pritchard and Melvin Smith. During the relevant time period, Gary Pritchard's adaptive age was approximately two years. He was mostly non-verbal and required assistance with all daily living skills. One of the Home of Hope goals for him was to reduce the bad behaviors he exhibited when he was in a crowd. He was employed in jobs requiring janitorial and maintenance skills, including sweeping.

109. During the relevant time period, the adaptive age of Melvin Smith was approximately two years. He was profoundly mentally retarded, and also suffered from a physical handicap. However, his abilities improved as a result of staff working with him.

110. From May 1996 through June 1996, Ms. Lacey worked in the home of Allen Moad and Joel McMullin. During the relevant time period, the adaptive age of Allen Moad was one year, eight months. He was profoundly mentally retarded and non-verbal. He had involuntary muscle movement due to the psychotropic medication he took. However, Program Coordinator Judy Baker observed Allen Moad dust, take clothes to the laundry, and take plates to the sink. Further, his employment required him to perform janitorial functions. There is no reason Allen Moad could not do household tasks at home.

111. During the relevant time period, the adaptive age of Joel McMullin was one year, four months. He was also profoundly mentally retarded, and he had limited communication skills. Nonetheless, he had several jobs which involved housekeeping and janitorial skills.

112. Since the clients in the Moad/McMullin house were active and liked to do things, there would not have been enough time to spend 20% of it performing house cleaning or other tasks unrelated to the clients' care.

113. Ms. Lacey claims that her clients refused to engage in required household cleaning activities; yet, she never used the procedural mechanisms in place to bring this to the attention of Home of Hope management, nor did she ever speak to the House Manager or Program Coordinator about this situation.

114. Judy Baker was the Program Coordinator for the Moad/McMullin house and the Pritchard/Smith house during the relevant time. During the relevant period, Ms. Baker saw some improvement in the skills of Gary Pritchard and Melvin Smith, but less improvement in the skills of Allen Moad and Joel McMullin. She testified that teaching daily living skills should have been an ongoing task which was incorporated into all other household tasks. She also testified that there is no reason to believe that clients could not perform household functions at home if those clients could perform the same functions at their jobs. She stated that client participation in household work sometimes requires prompting, but that is the reason Home of Hope hires an HTS.

115. As the Program Coordinator for the houses in which, Ms. Lacey worked, Ms. Baker believes that staff members could not have spent more than 20% of their time doing household work unrelated to the care of the client.

116. Ms. Lacey admitted that she volunteered for extra hours during the relevant time period so that she could make more money. Her answer to Interrogatory No. 25 (the estimate of her overtime hours for which she is claiming monetary relief) establishes that she did not spend in excess of 20% of her weekly hours worked performing general household work.

### Dixie Sparks

117. Plaintiff Dixie Sparks was employed in Home of Hope's Supported Living Program from March 1995 through

March 1998. During the relevant time, Ms. Sparks worked in the home of Shawn Allison. In January 1996, she became the House Manager of the Allison house until September 1996, when she was demoted from the House Manager position for failing to report an allegation of abuse and neglect by another staff member.

118. Ms. Sparks signed Shawn Allison's IHP, dated November 29, 1995. The IHP establishes that he could provide limited assistance in the area of household work due to his mental and physical disabilities. He was extremely hyperactive and required one-on-one staffing. He could perform household duties only with hand-over-hand assistance, but not for long periods of time. During the relevant period of time, Shawn Allison could do very little for himself, and he was totally dependent on the staff for all daily living skills.

119. At the time Ms. Sparks worked in the Allison house, plaintiffs Dale Jean Terwilliger and Tony Hooten also worked there, and Rebecca Collins was the Program Coordinator. Due to Shawn Allison's hyperactivity and many needs, and due to the number of staff in the house, it is implausible that each staff member spent ten hours of every 40–hour work week engaged in activities unrelated to his care. Most, if not all, of the work performed by Ms. Sparks in Shawn Allison's house was for the benefit of the client.

### Pat Turner

120. Plaintiff Pat Turner was employed in Home of Hope's Supported Living Program from May 14, 1992 to her termination on February 28, 1997.

121. During the relevant time period, Ms. Turner primarily worked in the home of Paula Cupp and Bobby Hartley, and in the home of Teresa McMahon. Paula Cupp, Bobby Hartley and Teresa McMahon were all "higher-functioning" clients and were very capable of doing household duties for themselves.

122. During the relevant time period, Paula Cupp's adaptive age was eleven years. One of her goals was to balance her own checkbook. She was considered a self-starter who was observed by DHS personnel performing household duties. She could vacuum, clean her bedroom, empty her trash, dust, and mop the floor.

123. During the relevant time period, Bobby Hartley's adaptive age was eight years, three months. He had many of the same goals as Paula Cupp. The Social Service Summary prepared by the DHS indicates that he "has the skills to independently complete all household duties."

124. During the relevant time period, Teresa McMahon's adaptive age was nine years, three months. Her goals were check writing, meal preparation and employment. Her Residential Assessments for the relevant time period demonstrate that she could independently clean her house. In addition, she was employed by Shangri–La Resort for two seasons, where her job tasks included loading dishes, putting away dishes, washing pots and pans, sweeping, mopping, taking out trash and general cleaning. Program Coordinator Rebecca Collins also witnessed Teresa McMahon mopping floors and doing general cleaning in connection with Teresa McMahon's job in Home of Hope's snack bar.

125. Several aspects of Ms. Turner's testimony were infirm. For example, Ms. Turner testified that gravel on a road near a home in which she worked created more dust in the home than most homes, but she failed to report this to anyone at Home of Hope. While Ms. Turner claims that cleaning was a major job function, cleaning is not listed as one of the four major job tasks required by Home of Hope in the performance evaluation she signed on May 14, 1996. Ms. Turner agreed that her job required her to help the clients learn living skills; nevertheless, she remade the clients' beds after they attempted to do so. Ms. Collins testified that it would not have been proper for Ms. Turner to remake clients' beds, as this engenders low self-esteem and teaches clients that there is no

reason to attempt to do things for themselves.

126. Ms. Turner also testified that she could not sleep at night in the clients' homes because she was worried about the possibility of fire; thus, she cleaned to pass the time. Ms. Collins was not aware of any employee who had ever stayed awake all night to clean a client's house. Ms. Collins testified that it would not have been necessary for Ms. Turner to stay up all night to protect the clients in case of a fire, as all houses in the Supported Living Program were equipped with smoke detectors. Further, Ms. Turner's testimony that she cleaned the fireplace once a week is not credible because, according to Rebecca Collins, fireplaces in the clients' homes were never used.

127. The documents contained in Ms. Turner's personnel file establish that she was terminated by Home of Hope after an employee of the bingo hall in Grove, Oklahoma reported that Ms. Turner took the clients with her to play bingo and did not leave the bingo hall until 3:00 a.m. Both Bobby Hartley and Paula Cupp wanted to leave earlier because they were tired, and they were required to be at work by 7:00 a.m. the next day.

128. Ms. Turner agreed that certain tasks she performed, such as sleeping, paperwork, and charting, are not reflected in her answer to Interrogatory No. 25. She also testified that her answer to Interrogatory No. 25 does not represent any one week. During the time period for which she seeks overtime, Ms. Turner vacationed with the clients; they took a trip to St. Louis for three days, a camping trip, and a trip to the Special Olympics. She could not have been cleaning while away on trips.

129. Due to the activity level in the houses where Ms. Turner worked and the abilities of the clients in those homes, it is implausible that Ms. Turner spent in excess of 20% of her work week doing general household work unrelated to the clients.

### *Tambra Suter*

130. Plaintiff Tambra Suter was employed as an HTS in Home of Hope's Supported Living Program from October 1995 through January 20, 1997. She is not claiming entitlement to overtime for the time she spent training. Ms. Suter finished her training on November 16, 1995 and began working in the home of Donald Morris and Corky Johnson. The Johnson/Morris house is 1,068 square feet.

131. During the relevant time period, Corky Johnson's adaptive age was approximately five years, five months. He was confined to a wheelchair. He had no use of one hand and limited use of the other hand. He was employed for a time at a hospital. During the relevant time period, Donald Morris' adaptive age was five years, five months. He had poor eyesight.

132. During the relevant time period, Judy Baker was the Program Coordinator for the Johnson/Morris house. She testified that Donald Morris and Corky Johnson were active clients. The clients went to appointments with doctors, took frequent rides, and attended Home of Hope dances and other activities. These activities required client transportation. This evidence does not support the testimony of Ms. Suter that she spent only one hour per week on client transportation.

133. Ms. Suter worked in the Morris/Johnson house until she quit in January 1997. Ms. Suter claims that her House Manager, Robin Standley, instructed her to keep the house "spotless." She worked from 3:00 p.m. to 9:00 a.m. during the week and from 3:00 p.m. Friday to 9:00 p.m. Saturday; she also worked from 9:00 a.m. to 9:00 p.m. Sunday.

134. Ms. Suter testified that she did not sleep during her overnight shift, so that none of her total weekly hours were spent sleeping. However, House Manager Robin Standley testified that she observed Ms. Suter carrying a blanket and pillow when she came into the house to work her shift. If staff members were not sleeping

in the house as Home of Hope management expected, they should have made Home of Hope management aware of the situation. It is not reasonable to believe that Ms. Suter did not sleep during her overnight shift. Nor would it be reasonable for Ms. Suter to spend ten hours of forty (more than 20% of her total weekly hours) doing general household work unrelated to the care of the clients she served.

### Summary Findings

135. At the evidentiary hearings in this matter, each plaintiff testified in detail as to the amount of time he or she spent on each household cleaning task (allegedly unrelated to the individual) daily or per shift, weekly and monthly. Plaintiffs testified room-by-room as to the specific tasks they performed, although not every plaintiff testified that he or she performed the same tasks that other plaintiffs performed. The Special Master found that much of this testimony lacked credibility. It is unreasonable to assume, for example, that anyone would clean out the refrigerator or wash curtains and mini-blinds in these homes on a weekly basis, or that anyone would wash the windows and clean the mirrors on a daily basis in his or her own home. Some plaintiffs even testified that they routinely moved appliances to clean behind them, and they routinely washed the light fixtures, walls and baseboards throughout the house.

136. The Special Master found more helpful the testimony regarding the needs, goals and abilities of the particular clients served. For example, in this matter Tim Bogle crawled and played on the floor for exercise. He also drooled on carpet and furniture. Vacuuming and cleaning the carpet would be directly related to his care. Shawn Allison had a condition which caused him to crave non-food items, and he was allergic to dust and mold. Dusting, sweeping, mopping and wiping countertops would be related to his care. By contrast, clients such as Bobby Hartley, Melva Green, Roberta Taylor, Sherry Robinson, Joel McMullen, Allen Moad, Gary Pritchard, Melvin Smith, and Paula Cupp had outside jobs in which they performed numerous cleaning tasks. There is no reason to suggest that they could not clean at home with some prompting and assistance from plaintiffs.

137. Home of Hope established by a preponderance of the evidence that no plaintiff spent in excess of 20% of his or her time performing general household work unrelated to the care of the client during the relevant time, given the sizes of the houses, the number of staff members assigned to each house, and the needs of the clients served.

## CONCLUSIONS OF LAW

### Overtime Compensation

1. The payment of overtime wages is governed by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

2. Under the FLSA, hourly workers must be compensated at a rate of one and one-half times their regular hourly wage for all hours worked in excess of 40 hours per work week. 29 U.S.C. § 207(a)(1).

3. Home of Hope is an employer covered by the overtime provisions of the FLSA.

4. Exemptions for the FLSA must be narrowly construed. *A.H. Phillips, Inc., v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945); *Schoenhals v. Cockrum,* 647 F.2d 1080, 1081 (10th Cir.1981).

### Companionship Exemption

5. The "companionship exemption" of 29 U.S.C. § 213(a)(15) provides that the overtime provisions of § 207 do not apply to:

> any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

6. The exemption also authorizes the Secretary of Labor to promulgate regulations interpreting the terms contained in the "companionship services" exemption.

7. Title 12, part 552 of the Code of Federal Regulations governs the administration of the companionship services exemption.

8. The term "companionship services" is defined in 29 C.F.R. § 552.6 to mean: those services which provide fellowship, care and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include housework related to the care of the aged or infirm person such as bed making, washing of clothes, and other similar services. They may also include the performance of general household work: Provided, however, that such work is incidental i.e., does not exceed over 20 percent of the total weekly hours worked. . . .

9. When construing an exception to the overtime provisions of the FLSA, the burden rests upon the employer to show that its employees are exempt from the Act. *Hays v. City of Pauls Valley*, 74 F.3d 1002, 1005 (10th Cir.1996).

11. Home of Hope has met its burden to establish that the services provided by the plaintiffs to developmentally-disabled clients in Home of Hope's Supported Living Program during the applicable limitations periods constituted companionship services.

### Household Work Exception

10. The "general household work" exception to the companionship services exemption provides that the exemption does not apply where "general household work" exceeds 20% of the total weekly hours worked. 29 C.F.R. § 552.6.

11. The regulation distinguishes between "household work related to the care of the aged or infirm persons" and "general household work." *Id.*

12. The term "general household work" is not defined within the regulations concerning the companionship exemption. Several courts, however, have attempted to define "general household work" and clarify the distinction between "household work related to the care of the aged or infirm persons" and "general household work" for purposes of the 20% exception. In *Toth v. Green River Regional Mental Health/Mental Retardation Board, Inc.*, 753 F.Supp. 216, 217 (W.D.Ky.1989), *aff'd sub nom Hengesback v. Green River Regional Mental Health/Mental Retardation Bd., Inc.*, 985 F.2d 560, 1993 WL 20126 (6th Cir.1993), the court held:

Dusting or cleaning the client's room or the living room 'appears to be routine, general household work, rather than work related to the individual. Cleaning a spill by the client in either room, by contrast, in either room, would be non-routine care more related to the individual than to the general household, and would not be included in the twenty percent figure.'

*Id.* at 217 (quoting *McCune v. Oregon Senior Services Div.*, 643 F.Supp. 1444, 1450 (D.Or.1986), *aff'd* 894 F.2d 1107 (9th Cir.1990)). The *McCune* court also stated: "The regulation defines household work related to the care of the individual to include meal preparation, bed making, washing of clothes, and 'other similar services.' These similar services would presumably include other types of personal care, such as bathing, feeding, or cleaning spills." *Id.* Similarly, other courts have focused on the particular task performed by plaintiffs.

The record shows that plaintiffs provided [clients] with some general maintenance services, including cleaning laundry areas, general household cleaning (through use of mop, duster, and vacuum), washing vehicles, cleaning the garage, and maintaining the yards and grounds. These services constitute general household services. Although they benefit the individual residents of [the residential facility for developmentally disabled individuals], they are ultimately

provided to keep [the facility] generally clean for the benefit of all employees and the family members and friends who visit the residents.

*Bowler v. Deseret Village Assoc., Inc.*, 922 P.2d 8, 15 (Utah 1996).

13. The Special Master recommends that the Court conclude that the language "other similar services" signifies the Secretary's intent not to limit the scope of services "related to the case of the . . . person" to those items specifically enumerated in 29 C.F.R. § 552.6.

14. In each instance, the test should be whether a particular task is necessary for the care or habilitation training of a particular client. If it is, then the task cannot be "general household work" unrelated to the individual client, and it does not count toward the 20% exception. Instead, the companionship exemption applies to the task, and the employer is not required to pay overtime wages to the plaintiff who performs it.

15. Although *Toth v. Green River* implies that the burden shifts to the plaintiff to prove the 20% or "general household work" exception to the "companionship services exception," 753 F.Supp. at 217, the Special Master recommends that this Court conclude that the burden remains with the employer to show that the 20% exception does not apply, since the employer is the party seeking to avoid payment of compensation for overtime hours.

16. Home of Hope has shown by a preponderance of the evidence that is it more likely than not that no plaintiff spent in excess of 20% of his or her total weekly work hours engaged in general household work.

17. Therefore, plaintiffs are not entitled to overtime compensation pursuant to the FLSA, 29 U.S.C. § 207.

### Policy Considerations

18. The Sixth Circuit has stated the following policy reason for the companionship exemption:

These critical services reach more elderly or infirm individuals than they other-

wise would precisely because the careproviders are exempt from the FLSA. We also note that many private individuals, who do not benefit from federal and state assistance, may also be forced to forego the option of receiving these services in their homes if the cost of the services increases. The only alternative for these individuals may be institutionalization.

*Salyer v. Ohio Bureau of Workers' Compensation*, 83 F.3d 784, 788 (6th Cir.), *cert. denied*, 519 U.S. 964, 117 S.Ct. 386, 136 L.Ed.2d 303 (1996) (quoting *McCune*, 894 F.2d at 1110).

19. The Special Master recognizes other, equally compelling policy concerns at issue in this matter. Home of Hope and similar agencies must be able to attract and retain capable and compassionate workers if they are to continue providing quality services that are essential and, in this jurisdiction, mandated for developmentally disabled individuals. They must also be continually concerned that the homes in which they provide services are safe and sanitary. Fair compensation for hours worked overtime would presumably assist in that endeavor.

20. However, the evidence showed that many of the plaintiffs in this matter knew, when they accepted employment with Home of Hope, that they would not be paid for overtime hours. Further, the evidence did not show that Home of Hope required plaintiffs to spend more than 20% of their time doing general household work.

21. While the relief granted by this Court should provide incentives for employees to keep clients' homes clean, it should not reward employees for performing unnecessary general household work just to pass the time or stay awake, nor should it serve to encourage them to perform unnecessary general household work for the sole purpose of obtaining additional compensation for overtime hours. Most importantly, it should never encourage employees to neglect the clients they serve.

## SUMMARY

The credible evidence presented at the evidentiary hearings did not show that any plaintiff spent more than 20% of his or her total weekly work hours performing general household work unrelated to the clients they served. For some clients, plaintiffs performed household work to teach the clients to perform household work on their own. For other clients, most of the work plaintiffs performed was "related to the individual" because those individuals were unable to do any household work on their own. The remainder of the household work that plaintiffs performed could not have exceeded 20% unless plaintiffs were spending time doing housework when they should have been spending time performing the work for which they were hired. Based upon the evidence presented at the hearings on the 20% issue, the Special Master recommends that the Court adopt the proposed findings of fact and conclusions of law set forth herein and enter judgment in favor of the defendant, Home of Hope.

## OBJECTIONS

The District Judge assigned to this case will conduct a *de novo* review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned. As part of the *de novo* review, the District Judge will consider the parties' written objections to the Report and Recommendation. A party wishing to file objections must do so within ten days after being served with a copy of the Report and Recommendation. *See* 28 U.S.C. § 636(b)(2) and Fed.R.Civ.P. 72(b). **The failure to file written objections may bar the party failing to object from appealing any of the factual or legal findings in this Report and Recommendation that are accepted or adopted by the District Court.** *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435

(1985); *Ayala v. United States,* 980 F.2d 1342 (10th Cir.1992).